FILED
CLERK, U.S. DISTRICT COURT

MAR 23 2011

CENTRAL DISTRICT OF CALIFORNIA
BY＿＿＿＿＿＿＿＿DEPUTY

1   Vito Torchia, Jr. (SBN 244687)
    torchiav@brookstone-law.com
2   Deron Colby (SBN 196686)
    dcolby@brookstone-law.com
3   Aalok Sikand (SBN 248165)
    asikand@brookstone-law.com
4   **BROOKSTONE LAW, PC**
    4000 MacArthur Blvd., Suite 1110
5   Newport Beach, California 92660
    Telephone: (800) 946-8655
6   Facsimile: (866) 257-6172

7   Attorneys for Plaintiffs,
    ANGELA SACCHI and ROBERT SACCHI
8

**BY FAX**

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12   ANGELA SACCHI, an individual; and       Case No.: CV 11-01658 AHM (CWx)
13   ROBERT SACCHI, an individual,
                                              *[Assigned to the Honorable*
14                                            *A. Howard Matz, Courtroom 14]*
                   Plaintiffs,
15
                                             **FIRST AMENDED COMPLAINT**
16        vs.                                **FOR:**

17   MORTGAGE ELECTRONIC               1. **CANCELLATION OF DEED;**
18   REGISTRATION SYSTEMS, INC., a     2. **SLANDER OF TITLE;**
     Delaware corporation, as nominee for
19   AMERICAN HOME MORTGAGE          3. **INJUNCTIVE RELIEF;**
20   CORPORATION d/b/a AMERICAN        4. **VIOLATION OF CALIFORNIA**
     BROKERS CONDUIT; AMERICAN           **CODE §2923.5; and**
21   HOME MORTGAGE SERVICING,
22   INC., a Delaware corporation;        5. **UNFAIR COMPETITION**
     AMERICAN HOME MORTGAGE               **[VIOLATIONS OF CAL. BUS. &**
23   CORPORATION d/b/a AMERICAN           **PROF. CODE §17200 *ET SEQ.*]**
                                          **(INCLUDING INJUNCTIVE**
24   BROKERS CONDUIT, a New York          **RELIEF TO VOID**
     corporation; RESIDENTIAL CREDIT      **MORTGAGE)**
25   SOLUTIONS, INC., a Delaware
26   corporation; FIDELITY NATIONAL     Action Filed: January 21, 2011
     TITLE COMPANY d/b/a DEFAULT       Action Removed: February 24, 2011
27   RESOLUTION NETWORK, a            Trial Date: None Set
28   California corporation; DEFAULT

                                    - 1 -
                          **FIRST AMENDED COMPLAINT**

RESOLUTION NETWORK, an unknown entity; POWER DEFAULT SERVICES, Inc., a Texas Corporation; LANDAMERICA COMMONWEALTH, an entity of unknown form; and DOES 1 to 1000, inclusive,

Defendants.

COMES NOW Plaintiffs ANGELA SACCHI and ROBERT SACCHI, and each of them and complain of Defendants MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware corporation, as nominee for AMERICAN HOME MORTGAGE CORPORATION d/b/a AMERICAN BROKERS CONDUIT; AMERICAN HOME MORTGAGE SERVICING, INC., a Delaware corporation; AMERICAN HOME MORTGAGE CORPORATION d/b/a AMERICAN BROKERS CONDUIT, a New York corporation; RESIDENTIAL CREDIT SOLUTIONS, INC., a Delaware corporation; FIDELITY NATIONAL TITLE COMPANY d/b/a DEFAULT RESOLUTION NETWORK, a California corporation, DEFAULT RESOLUTION NETWORK, an unknown entity, POWER DEFAULT SERVICES, INC., a Texas corporation; LANDAMERICA COMMONWEALTH, an entity of unknown form, and each of them (collectively, "Defendants"), and DOES 1 to 1000, inclusive, and each of them, in filing this First Amended Complaint ("FAC") for causes of action based on the following allegations:

## **THE PARTIES**

1.     At all times relevant hereto, plaintiffs ANGELA SACCHI and ROBERT SACCHI, and each of them ("Plaintiffs"), were and are adults living within this County and Judicial District.  At all such times, Plaintiffs were, and still

**FIRST AMENDED COMPLAINT**

are, the owners of certain real property located within this County and Judicial District, commonly known as **203 N. Gramercy Place, Los Angeles, California 90004** (the "Property").  The legal description of the Property is found on the Quitclaim Deed, which is set forth in the attached **Exhibit A**.

2.      Plaintiffs are informed and believe, and on that basis allege, that at all times relevant hereto, defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") was and is a corporation duly formed and existing under the laws of the state of Delaware.  Plaintiffs are further informed and believe, and on that basis allege, that at all times relevant hereto, defendant MERS was acting solely as "nominee" for defendant AMERICAN HOME MORTGAGE CORPORATION d/b/a AMERICAN BROKERS CONDUIT ("ABC"), with no power to act other than on said defendant's behalf.

3.      Plaintiffs are informed and believe, and on that basis allege, that at all times relevant hereto, defendant AMERICAN HOME MORTGAGE SERVICING, INC. ("AHMSI") was and is a corporation duly formed and existing under the laws of the state of Delaware.  Plaintiffs are further informed and believe, and on that basis allege, that defendant AHMSI was acting as servicing agent and alleged "creditor" with respect to the mortgage loan.

4.      Plaintiffs are informed and believe, and on that basis allege, that at all times relevant hereto, defendant ABC was and is a corporation formed and exiting under the laws of the state of New York.  Plaintiffs are further informed and believe, and on that basis allege, that at all times relevant hereto, defendant MERS was acting as "nominee" for defendant ABC with undefined powers and obligations to act on said defendant's behalf.

5.      Plaintiffs are informed and believe, and on that basis allege, that at all times relevant hereto, defendant RESIDENTIAL CREDIT SOLUTIONS, INC. ("RCS") is a corporation under the laws of the state of Delaware, with its principal offices in the city of Los Angeles, California.

**FIRST AMENDED COMPLAINT**

6.     Plaintiffs are informed and believe, and on that basis allege, that at all times relevant hereto, defendant FIDELITY NATIONAL TITLE COMPANY ("FIDELITY") d/b/a DEFAULT RESOLUTION NETWORK was and is a corporation duly charted and existing under the laws of the state of California with its principal place of business in California.  Plaintiffs are further informed and believe, and on that basis allege, that defendant FIDELITY was acting as the purported Trustee under the Deed of Trust executed by Plaintiffs as part of the mortgage transaction.

7.     Plaintiffs are unaware of the true form, whether corporate or otherwise, of defendant DEFAULT RESOLUTION NETWORK, INC. ("DRN").

8.     Plaintiffs are informed and believe, and on that basis allege, that at all times relevant hereto, defendant POWER DEFAULT SERVICES, INC. ("PDS"), was and is a corporation formed and existing under the laws of the state of Texas.

9.     Plaintiffs are informed and believe, and on that basis allege, that at all times relevant hereto, defendant LANDAMERICA COMMONWEATLH ("LandAmerica") is an entity of unknown form at the time of the filing of this FAC.

10.     Plaintiffs are unaware of the true names and capacities of the defendants sued herein as DOES 1 through 1000, inclusive, and therefore sue said defendants by such fictitious names.  Plaintiffs will seek leave to amend this Complaint to allege the true names and capacities of said defendants when the same are ascertained. Plaintiffs are informed and believe, and on that basis allege, that each of these fictitiously named defendants claim some right, title, estate, lien, or interest in the Property adverse to Plaintiffs' title; that each of them is responsible in some manner for the wrongful conduct alleged; and that their claims, and each of them, constitute a cloud or potential cloud on Plaintiffs' title to that property.

- 4 -

**FIRST AMENDED COMPLAINT**

11.    Plaintiffs are informed and believe, and on that basis allege, that at all times relevant hereto, each defendant sued herein was the agent, servant and/or employee of each of the co-defendants, and in doing the things herein alleged, was acting both individually and within the authority and/or scope of such agency.

## FACTS

12.    On or about July 16, 2007, Plaintiffs executed in favor of defendant ABC a certain "ADJUSTABLE RATE NOTE" (the "Note") in the original principal sum of $825,000.00, payable with interest as provided in the Note.  A true and correct copy of the Note is attached hereto, marked as **Exhibit B** and incorporated herein by this reference.  Said Note was purportedly secured by a Deed of Trust of the same date executed by Plaintiffs, as Trustors, in favor of defendant MERS, ostensibly as the "beneficiary" of the Deed of Trust, and defendant LandAmerica as Trustee.  A true and correct copy of the Deed of Trust, recorded in the Official Records of the County of Los Angeles, State of California on July 25, 2007, as Instrument No. 2007-1753960, is attached hereto, marked as **Exhibit C** and incorporated herein by this reference.

13.    On or about January 3, 2010, a "Juan Enriquez" signed a document entitled "Fidelity National Title Company—Affidavit of Mailing," on behalf of defendant FIDELITY, wherein Mr. Enriquez "declares," presumably under penalty of perjury, that "A copy of the ***attached Substitution of Trustee*** was mailed to all those persons required by California Civil Code Section 2924b and in the manner required by Section 2934a[b]" (emphasis added).  The "attached Substitution of Trustee," which specifically references Mr. Enriquez's Affidavit, is the Substitution of Trustee signed by defendant RCS on November 17, 2010 and recorded on January 6, 2011.  The Substitution of Trustee, again signed over 11 months ***after*** Mr. Enriquez's affidavit, substitutes defendant FIDELITY in as trustee for the original trustee, defendant LandAmerica.  In short, at the time

**FIRST AMENDED COMPLAINT**

1  defendant FIDELITY's agent, Mr. Enriquez, signed the statutorily required
2  affidavit attesting that the mailing of the Substitution of Trustee occurred
3  according to the law, the document that was allegedly mailed had not even been
4  signed and would not be signed and recorded for almost one year.  As such, the
5  Substitution of Trustee substituting defendant FIDELITY in as trustee is fatally
6  defective and did not and could not have conferred the authority on FIDELITY to
7  foreclose on the Property.  A true and correct copy of the purported Substitution of
8  Trustee, including the attached Affidavit, is attached as **Exhibit D**.

9        14.     Also on or about January 3, 2010, Mr. Enriquez, on behalf of
10  defendant PDS, as "Trustee, By: Fidelity National Title Company, its agent…,"
11  signed a Notice of Trustee's Sale ("NTS") wherein the sale of the Property was set
12  for January 26, 2011.  The NTS was recorded on January 6, 2011, over one year
13  *after* Mr. Enriquez signed the NTS.  The NTS was signed prior to any default by
14  Plaintiffs, prior to any service or recording of a Notice of Default ("NOD") and
15  prior to the ripening of any of the defendants' right to begin foreclosure
16  proceedings against Plaintiffs.  As such, the NTS was a legal nullity, extinguishing
17  defendants' rights to foreclose on Plaintiffs.  A true and correct copy of the Notice
18  of Trustee Sale is attached as **Exhibit E**.

19        15.     On or around May of 2010, many months ***before*** defendant
20  FIDELITY was substituted in as Trustee but ***after*** defendant FIDELITY signed the
21  NTS, Plaintiffs began experiencing financial hardship and for the first time fell
22  behind in their mortgage payments.  At or around this time, Plaintiffs were
23  approached by two affiliated companies named U.S. Loan Auditors and My U.S.
24  Legal Services, Inc. (collectively "USLA").  Plaintiffs were told that if they paid
25  the USLA $8,000 plus $1,400 a month that USLA would force Plaintiffs' lender to
26  grant relief in the form of a principal reduction and/or loan modification.  Plaintiffs
27  paid USLA $8,000 and authorized USLA to withdraw $1,400 from their bank
28  account.  Around this same time, Plaintiffs were contacted by a "Jay Severs" who

**FIRST AMENDED COMPLAINT**

purportedly worked for AHMSI.  Mr. Severs explained that he could help Plaintiffs and possibly get the principal balance of Plaintiffs' loan reduced.  Plaintiffs told Mr. Severs that they had hired USLA to negotiate with AHMSI and provided USLA's information to Mr. Severs.  Plaintiffs never heard from AHMSI again.

16.     After 4 months of paying $1,400 a month, no return phone calls, no contact and no results, Plaintiffs stopped paying USLA.  During this period of time, Plaintiffs were unable to pay their mortgage.  Plaintiffs later learned that USLA filed for bankruptcy.  Plaintiffs received a document indicating that they could make a claim against USLA in bankruptcy court for the fees they paid.

17.     On or about August 9, 2010, defendant DRN, designated as "agent for the Beneficiary by ServiceLink, its agent, through ServiceLink, as agent, through SPL Inc., as authorized agent," recorded a Notice of Default ("NOD") on Plaintiffs' Property.  Plaintiffs are informed and believe that defendant DRN is a division of FIDELITY.  A true and correct copy of the Notice of Default is attached hereto marked as **Exhibit F** and incorporated herein by this reference. Prior to the filing of the NOD, none of the defendants made any effort to contact Plaintiffs for purposes of assessing Plaintiffs' financial situation and explore options for Plaintiffs to avoid foreclosure.

18.     On or about November 17, 2010, Jeffrey Gideon, on behalf of defendant RCS, signed a Substitution of Trustee purporting to substitute defendant FIDELITY in as the new trustee under the Deed of Trust.  However, there is no recording documenting that MERS assigned the Deed of Trust to RCS.  As explained in paragraph 19, the Assignment of the Deed of Trust assigning the Deed of Trust and Note to RCS was not signed until over one month later.  Thus, at the time of this transaction, RCS had no beneficial interest in the property and furthermore had no legitimate power to substitute FIDELITY in as the new trustee. The Substitution of Trustee was recorded on January 6, 2011.

**FIRST AMENDED COMPLAINT**

19.     On or about December 22, 2010, Jeffrey Gideon, who in November of 2010 had signed the Substitution of Trustee on behalf of RCS, signed, on behalf of defendant MERS this time, an Assignment of Deed of Trust wherein defendant MERS assigned its rights to the Deed of Trust and Note underlying Plaintiffs' loan to defendant RCS.  The Assignment of Deed of Trust was also recorded on January 6, 2011.  At the time of the aforementioned assignment, defendant MERS did not possess the requisite power, authority and interest to make the assignment.

20.     Finally, the third recording to occur on January 6, 2011, was the NTS.  As mentioned earlier, the NTS was signed by Mr. Enriquez, on behalf of defendant FIDELITY, over one year before the actual NTS was recorded.  Defendant PDS, as Trustee by defendant FIDELITY, recorded the NTS which scheduled a trustee's sale for January 26, 2011.  For the reasons stated herein, neither defendant PDS nor defendant FIDELITY had the authority, ostensible or otherwise, to sign and record the NTS.  As such, the NTS is a legal nullity.

21.     On or about January 14, 2011, Plaintiffs attempted to contact defendant AHMSI but to no avail.  Plaintiffs were informed that they would have to communicate with defendant RCS.  Plaintiffs had no idea who owned the Note underlying their mortgage or who to communicate with.  Plaintiffs eventually got a hold of defendant RCS.  The contact was brief and very terse.  Defendant RCS' representative, "Junie," was very rude, not helpful and explained to Plaintiffs that there was nothing that defendant RCS could do, that only the "lender" or "investor" could modify the loan, and that defendant RCS had no power to do so.  Plaintiffs were never provided with information as to who the mysterious "investor" was.

//
//
//
//

**FIRST AMENDED COMPLAINT**

# FIRST CAUSE OF ACTION

## (*By Plaintiffs – Cancellation of Deeds – Against All Defendants*)

22.     Plaintiffs re-allege and incorporate by this reference every preceding paragraph of this FAC, as though fully set forth hereafter.

23.     Plaintiffs are informed and believe, and on that basis allege, that at all times relevant hereto, defendant MERS was and is a private corporation that administers the MERS System, a national electronic registry that tracks the transfer of ownership interests and servicing rights in mortgage loans.  Through the MERS System, MERS becomes the mortgagee of record for participating members through assignment of the members' interests to MERS.  MERS is listed as the grantee in the official records maintained at county register of deeds offices.  However, the lenders retain the promissory notes, as well as the servicing rights to the mortgages.  The lenders can then sell these interests to investors without having to record the transaction in the public record.  MERS is compensated for its services through fees charged to participating MERS members.  At no time does MERS hold a beneficial interest in the promissory notes or the deeds of trust or mortgages that secure same.  Thus, any purported assignment of Deed of Trust from MERS to any future party would be unauthorized and wrongful.

24.     Defendants FIDELITY, DRN and RCS cannot prove that they have any beneficial interest in the property.  For the reasons specified herein, the acts taken by defendants were unauthorized and wrongful and entirely contrary to the required statutory scheme.

25.     Additionally, FIDELITY, or its alleged agents, POWER, and DRN, have no power to sell Plaintiffs' Property because RCS never had the authority to substitute FIDELITY as the trustee under the Deed of Trust.

26.     By virtue of the foregoing, the purported foreclosure of Plaintiffs' Property, conducted by DRN and POWER on behalf of FIDELITY and RCS was unauthorized and wrongful.  As a result Plaintiffs are entitled to, and still own, the

**FIRST AMENDED COMPLAINT**

Property, and are entitled to have their ownership of the Property reflected in the Official Records of Los Angeles County, California.  Nonetheless, the Deed of Trust, the Notice of Default, and the Notice of Sale constitute clouds on Plaintiffs' title and cause the Official Records of Los Angeles County, California to reflect said Defendant as the current, actual owner of said Property.  If these recorded documents are left outstanding, Plaintiffs may lose their property to a purchaser from Defendant RCS for value and without notice of the invalidity of these documents.

## SECOND CAUSE OF ACTION

### (*By Plaintiffs – Slander of Title – Against All Defendants*)

27.     Plaintiffs re-allege and incorporate by this reference every preceding paragraph of this FAC, as though fully set forth hereafter.

28.     The designation of MERS, who was not, and never has been, the holder of the Note, as the "beneficiary" under the Deed of Trust as well as the robo-signing, backdating, and other inappropriate and wrongful acts described herein render the Deed of Trust, the Notice of Default, as well as any related proceedings, a legal nullity.  As a result the Deed of Trust, the Notice of Default, the Notice of Sale, the Assignment of Deed of Trust and the Substitution of Trustee, and each of them, were and are invalid, and constitute improper clouds on Plaintiffs' title to the Property.

29.     The recordation of the foregoing documents was false, wrongful, without justification, in violation of statute, and without privilege, and caused doubt to be placed on Plaintiffs' title to the Property.

30.     The recording of the foregoing documents directly impaired the vendibility of the property on the open market in the sum of not less than $825,000.00, or such other sum as may be proved at the time of trial.

**FIRST AMENDED COMPLAINT**

31.     The recording of the foregoing documents made it necessary for Plaintiffs to retain attorneys and to bring this action to cancel the instruments casting doubt on Plaintiffs' title.  Therefore, Plaintiffs are entitled to recover attorneys' fees and costs incurred in cancelling the instrument.  The exact amount of such damages is not known to Plaintiffs at this time, and Plaintiffs will move to amend this complaint to state such amount when the same becomes known, or on proof at the time of trial.

### THIRD CAUSE OF ACTION

**(*By Plaintiffs – Injunctive Relief – Against All Defendants*)**

32.     Plaintiffs re-allege and incorporate by this reference every preceding paragraph of this FAC, as though fully set forth hereafter.

33.     Subsequent to the recordation of the Notice of Trustee's Sale, **Exhibit E** hereto, Defendant RCS intends to foreclose on Plaintiffs' home through FIDELITY.  Defendants purporting to foreclose on Plaintiffs' Property have failed and refused to comply with statutory and legal requirements to foreclose on Plaintiffs' property.

34.     For the reasons set forth hereinabove, the Deed of Trust, and any and all proceedings taken pursuant to it, were and are a legal nullity, and Plaintiffs are entitled to continue in possession of the Property notwithstanding the purported foreclosure of the Deed of Trust.  Thus, Defendants' threatened wrongful conduct, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to Plaintiffs, as the foreclosure sale of the Property will wrongfully dispossess them of their right to possession of the property, displace them from their home, and will subject Plaintiffs to unwarranted and unnecessary humiliation and emotional distress as a result of their wrongful eviction from the Property.

**FIRST AMENDED COMPLAINT**

35.     Plaintiffs have no adequate remedy at law for the injuries that will occur if the threatened foreclosure sale is permitted to proceed in that it will be extremely difficult, if not impossible, for Plaintiffs to determine the precise amount of damage they will suffer if Defendants' conduct is not restrained.  Moreover, real property is considered unique in California, and monetary damages are deemed inadequate to compensate Plaintiffs for the loss thereof.

## FOURTH CAUSE OF ACTION

### (By Plaintiffs – Violation of California Civil Code §2923.5 – Against All Defendants)

36.     Plaintiffs re-allege and incorporate by this reference every preceding paragraph of this FAC, as though fully set forth hereafter.

37.     Effective September 6, 2008, the Perata Mortgage Relief Bill became part of the law of the State of California and added sections 2923.5 and following to the California Civil Code to alleviate what the State Legislature called an "unprecedented threat" to the state's economy caused by the skyrocketing number of residential foreclosures.  The law requires that before filing a Notice of Default, a lender must contact a borrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure, to advise the borrower of his/her right to a meeting and to schedule a meeting with the borrowers within 14 days of initial contact.

38.     On or about August 9, 2010, defendant DRN, as "agent for the beneficiary by: ServiceLink, its agent through ServiceLink as Agent, through SPL Inc., as authorized agent" recorded a Notice of Default due to non-payment of the note.  The Notice of Default did not include a declaration that defendants, or any of them, complied with California Civil Code §2923.5.  This is because before the Notice of Default was filed, defendants violated California Civil Code § 2923.5 by

failing to discuss with Plaintiffs loan modification programs or other options to avoid foreclosure.

39.    Plaintiffs' primary intention is and at all time has been to keep the Property as their family residence.

40.    Plaintiffs' income has improved and they are ready and willing and able to make payments under a fair and reasonable permanent modification reached by the parties in a judicially supervised settlement conference.

41.    Plaintiffs seek an order for the parties to participate in good faith in a judicially supervised settlement conference that will be deemed full compliance with the requirements of California Civil Code §2923.5 and Plaintiffs further seek a Court Order for postponement of the Trustee Sale.

## FIFTH CAUSE OF ACTION

### (*By Plaintiffs – Unfair Competition – Against All Bank Defendants*)

42.    Plaintiffs re-allege and incorporate by this reference every preceding paragraph of this FAC, as though fully set forth hereafter.

43.    Defendants implemented and perpetrated a fraudulent scheme of inducing Plaintiffs to accept a mortgage for which they were not qualified based on inflated property valuations and undisclosed disregard of their own underwriting standards and the sale of overpriced collateralized mortgage pools, all the while knowing that the plan would crash and burn, taking the Plaintiffs down and costing them the equity in their homes and other damages.  The foregoing conduct violates numerous state statutes and common law protections enacted for consumer protection, privacy, trade disclosure, and fair trade and commerce

44.    The Defendants perpetrated their fraudulent scheme of selling off overpriced loans by making willful and inaccurate credit disclosures regarding Defendants' borrowers, including Plaintiffs, to third parties.  This false credit disclosure was critical to the success of Defendants' continued sales of the massive

**FIRST AMENDED COMPLAINT**

pools of mortgage loans necessary to perpetuate the scheme. The Defendants were aware that if the true credit profiles of the borrowers and the values of their real estate were accurately disclosed, the massive fraudulent scheme would end. As a result, the Defendants repeated, reinforced and embellished their false disclosures.

45.   The Defendants knew the borrowers' credit was inadequate to support continued loan payments, absent unsustainable inflation of property values. These pervasive false credit disclosures to third parties (including purchasers of bundled mortgage pools created by the Defendants) constituted false credit reports in violation of various statutes and these pervasive false disclosures permitted the Defendants to continue their scheme and victimize the Plaintiffs.

46.   These pervasive false disclosures also caused the real estate bubble to burst. Once it became known that some of the information provided by Defendants was false, the market for the sale of bundled loans dried up. The Defendants began to issue foreclosure notices, property values began dropping, and then, under the weight of *deflation* in a market that requires *inflation*, the equity investments made by Plaintiffs and others in their homes was lost

47.   Defendants violated Cal. Civil Code §2924 *et seq*. by wrongfully foreclosing on Plaintiffs.

48.   Defendants violated California common law by pursuing foreclosures through mere nominees, such as MERS, and without proof they owned the notes and deeds of trust underlying their foreclosure actions

49.   The forgoing fraudulent concealment, material misstatements, and the intentional violations of state statutes cited herein constitute unlawful, unfair and fraudulent business acts or practices and so constitute unfair business practices within the meaning of the California Unfair Practices Act. Cal. Bus. & Prof. Code §§17200, 17500. Sections 17200 *et seq*. of the California Business & Professions Code provides, in the disjunctive, for liability in the event of any such "unlawful, unfair or fraudulent business act or practice."

- 14 -

**FIRST AMENDED COMPLAINT**

50.     The violations described herein are unlawful, in that they violate California law.  These violations are the basis for liability under §17200 of the Business and Professions Code, as is the unlawful and fraudulent activity described herein.

51.     The actions described herein are unfair and patently fraudulent in that they were conducted for the sole purpose of perpetuating an unlawful and unsustainable investment scheme.

52.     As a result of the actions, concealment and deceit described herein, Plaintiffs have suffered material financial injury in fact, including as described elsewhere in this FAC, loss of equity in their home, costs and expenses related to protecting themselves, reduced credit scores, unavailability of credit, increased costs of credit, reduced availability of goods and services tied to credit ratings, increased costs of those services, as well as fees and costs, including, without limitation, attorneys' fees and costs.

53.     California Civil Code § 2923.5 requires that each mortgagee, trustee, beneficiary, or authorized agent may not file a notice of default pursuant to California Civil Code § 2924 until 30 days after initial contact is made as required therein, or 30 days after satisfying the due diligence requirements to contact the mortgage described therein.  Defendants violated the foregoing law by causing a notice of default to be filed against Plaintiffs without the mandatory notice. Defendants did not diligently endeavor to contact the Plaintiffs as required by §2923.5(g) and Defendants thereby also violated California Civil Code §§ 2923.5 and 2924.

54.     As a result of the foregoing unlawful conduct, Plaintiffs suffered further injury in fact by the filing of notices of default and as such the Plaintiffs suffered monetary and property loss.  Such injuries and loss included diminished credit scores with a concomitant increase in borrowing costs and diminished access to credit, fees and costs, including, without limitation, attorneys' fees and costs

**FIRST AMENDED COMPLAINT**

with respect to wrongful notices of default and loss of some or all of the benefits appurtenant to the ownership and possession of real property.

55.     The foregoing unlawful activities were pervasive and violate Business and Professions Code § 17200 *et seq.*

56.     As a result of Defendants' unfair competition, Plaintiffs are entitled to restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without limitation, interest payments made by Plaintiffs, fees paid to Defendants, including, without limitation, the excessive fees paid at Defendants' direction as alleged by the FTC, and premiums received upon selling the mortgages at an inflated value.

57.     Plaintiffs are also entitled to the issuance of a temporary restraining order, a preliminary injunction, and a permanent injunction restraining and enjoining Defendants from any further concealment with respect to the sale of notes and mortgages, any further violation of §2923.5, any further violation of California law.

58.     Plaintiffs are entitled to such relief as is set forth in this Cause of Action and such further relief as is set forth below in the section captioned Prayer for Relief which is by this reference incorporated herein.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs ANGELA SACCHI and ROBERT SACCHI, and each of them, pray judgment against the Defendants, and each of them, as follows:

### **On the First Cause of Action**

1.     For the Court's declaration that the documents recorded by the Defendants are void;

2.     For the Court's Order that the Defendants, and each of them, deliver the originals of the documents recorded by them forthwith to the Clerk of the Court for cancellation;

**FIRST AMENDED COMPLAINT**

## On the Second Cause of Action

3.     For monetary damages in the sum of not less than $825.000.00, or such other sum as may be proved at the time of trial;

4.     For damages caused Plaintiffs by the inconvenience and time suffered by Plaintiffs in removing this cloud on Plaintiffs' title; and

5.     For attorney's fees and costs incurred in removing the cloud on Plaintiffs' title according to proof;

## On the Third Cause of Action

6.     For an order requiring Defendants to show cause, if any they have, why they should not be enjoined as set forth in this Complaint, during the pendency of this action;

7.     For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants, and each of them, and their respective agents, servants, and employees, and all persons acting under, in concert with, or for them, from proceeding with a foreclosure sale of Plaintiffs' Property or otherwise attempting in any manner to dispossess Plaintiffs from possession of the Property; or taking any action to enforce any other remedy purportedly provided to them by the Deed of Trust.

## On the Fourth Cause of Action

8.     For an order enjoining defendants from foreclosing on Plaintiffs' Property until and unless defendants meet the requirements of California Civil Code §2923.5;

9.     For an order that all parties participate in a good faith in a judicially supervised settlement conference that will meet the requirements of California Civil Code §2923.5.

## On the Fifth Cause of Action

10.     For restitution for all sums received by Defendants with respect to Defendants' unlawful and/or unfair and/or fraudulent conduct, including, without

**FIRST AMENDED COMPLAINT**

1    limitation, interest payments made by Plaintiffs, fees paid to Defendants,
2    including, without limitation, the excessive fees paid at Defendants' direction as
3    alleged by the FTC, and premiums received upon selling the mortgages at an
4    inflated value.

5        11.    For the issuance of a temporary restraining order, a preliminary
6    injunction, and a permanent injunction restraining and enjoining Defendants from
7    any further concealment with respect to the sale of notes and mortgages, any
8    further violation of §2923.5, any further violation of California law.

9                         **On All Causes of Action**

10        12.    For compensatory damages according to proof;

11        13.    For costs of suit herein;

12        14.    For recovery of attorneys' fees; and

13        15.    For such other relief as the Court may deem just and proper.

14

15    Dated:  March 23, 2011              Respectfully submitted,
16                                        **BROOKSTONE LAW, PC**
                                          Vito Torchia, Jr.
17                                        Deron Colby
                                          Aalok Sikand
18

19                                        By:  _____
20                                             Deron Colby
21                                             Attorneys for Plaintiffs
                                               ROBERT SACCHI and
22                                             ANGELA SACCHI
23

24

25

26

27

28

                              - 18 -

# EXHIBIT A

Jan 20 11 12:49p       The Mail Shoppe          3234661035                    p.5

...COMMONWEALTH LAND TITLE CO.
RECORDING REQUESTED BY:
LANDAMERICA COMMONWEALTH LAND TITLE

AND WHEN RECORDED MAIL TO:

ANGELA SACCHI
203 N. GRAMERCY PLACE
LOS ANGELES, CA 90004

07/25/07



20071753959

---

Title Order No.: 5081075-6

5516-019-010

Escrow No.: 70815-70

**QUITCLAIM DEED**

THIS SPACE FOR RECORDER'S USE ONLY:

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
DOCUMENTARY TRANSFER TAX is $NONE   CITY TRANSFER TAX $NONE

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area   [X] City of LOS ANGELES AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

"THIS IS A BONAFIDE GIFT AND
THE GRANTOR RECEIVED NOTHING
IN RETURN, R & T 11911"

ANGELA SACCHI, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY

do(es) hereby remise, release and forever quitclaim to:

ANGELA SACCHI AND ROBERT SACCHI, WIFE AND HUSBAND AS JOINT TENANTS

the real property in the City of LOS ANGELES, County of Los Angeles, State of California, described as:

Lot 70 of Westfields as per Map recorded in Book 15, Pages 170 and 171 of Maps, in the Office of the County
Recorder of Los Angeles County, State of California.
A.P. # 5516-019-010

DATED July 3, 2007
STATE OF CALIFORNIA
COUNTY OF   Los Angeles
On   7-19-07
Before me,   Anna Sinanian
A Notary Public in and for said State, personally appeared

Angela Sacchi

personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature

ANGELA SACCHI

ANNA SINANIAN
Commission # 1745006
Notary Public - California
Los Angeles County
My Comm. Expires May 13, 2011

(This area for official notarial seal)

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE:

**EXHIBIT B**

## ADJUSTABLE RATE NOTE

(First Five Years - Stated Rate, Reduced Initial Payments;
Libor One-Month Index (As Published In The Wall Street Journal)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. DURING THE FIRST 5 YEARS OF THIS NOTE, MY MONTHLY PAYMENT MAY NOT FULLY PAY THE INTEREST THAT ACCRUES. AS A RESULT, THE PRINCIPAL AMOUNT I REPAY MAY BE LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN 120.000 % OF THE ORIGINAL AMOUNT (OR $ 990,000.00 ). THIS NOTE LIMITS THE MAXIMUM INTEREST RATE I MUST PAY AND MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE.

| July 16, 2007 | Glendale | California |
|---|---|---|
| [Date] | [City] | [State] |

203 North Gramercy Place, Los Angeles, CA  90004
[Property Address]

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 825,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender.   The Lender is American Brokers Conduit
. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. This Note carries an Initial Stated Interest Rate of   7.375  % until the last day of the Initial Period.  The period from the date of this Note until the date that is 60  months after the last day of the month in which the Note is executed is called the "Initial Period." The First Payment Date is specified in Section 3(A) of this Note.  After the Initial Period, the interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.    PAYMENTS**

(A)    Time and Place of Payments

I will make payments every month.  In this Note, unless otherwise specified, "payment" refers to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with monthly payments.

I will make monthly payments on the first day of each month, beginning on the first day of the second month that follows the month of the date of this Note, or  September 1, 2007   , the "First Payment Date."

After the Initial Period, I will make monthly payments on the first day of every month as provided in Sections 4(G) and 4(H) of this Note.

Each monthly payment will be applied to interest before Principal.  If, on  August 1, 2037    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   PO Box 660029, Dallas, TX  75266-0029
   or at a different place if required by the Note Holder.

(B)    Amount of My Initial Monthly Payments

Subject to Section 4(F), during the Initial Period, my monthly payment will be in the amount of U.S. $  2,847.24    .  This minimum monthly payment is not based on the Initial Stated Interest Rate and will not fully pay the interest that accrues each month during the Initial Period. Effective upon the first Payment Change Date, my monthly payment will be

5 Year Stated Rate, Payment Option, ADJUSTABLE RATE NOTE (One Month Libor)
Doc # 946762/946762.prn  App# 0001830456

ARM-2002M(MULTX)(02/07)
(page 1 of 4 pages)

calculated as provided in Section 4(G) or Section 4(H) of this Note, as applicable.

    **(C)**    **Monthly Payment Changes**

    After the Initial Period, changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment as provided in Section 4(G) or Section 4(H) of this Note, as applicable.

**4.**    **INTEREST RATE AND MONTHLY PAYMENT CHANGES**

    **(A)**    **Change Dates**

    The interest rate I will pay may change on ___August 1st___, 2012 , and on that day every month thereafter. Each date on which my interest rate could change is called a "Change Date."

    **(B)**    **The Index**

    Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one month U.S. dollar-denominated deposits in the London market ("**LIBOR**"), as published in The Wall Street Journal. The most recent Index figure available 15 days before the first Change Date and each Change Date thereafter is called the "Current Index."

    If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

    **(C)**    **Calculation of and Effective Date of Rate Changes**

    After the Initial Period, my new interest rate will be calculated by adding ___Two and Three Quarters___ percentage points ( 2.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, my new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment due date after the first Change Date until the amount of my monthly payment changes again as provided in this Note. After the Initial Period, each date on which my payment changes is called a "Payment Change Date."

    **(D)**    **Limits on Interest Rate Changes**

    The interest rate I am required to pay upon the first Change Date and each Change Date thereafter will not be less than the Margin. My interest rate under this Note will never be greater than 12.950 %.

    **(E)**    **Initial Monthly Payment Amounts; Possibility of Negative Amortization**

    During the Initial Period, my minimum required monthly payment will be less than the amount of interest that accrues on the Principal balance of the loan at the Initial Stated Rate. During the Initial Period, for each month that my monthly payment is less than the amount of interest that accrues on the Principal balance of the loan at the Initial Stated Rate, the Note Holder will subtract the amount of the monthly payment from the amount of the interest that accrues on the Principal balance of the loan for that month and add the difference to the Principal balance of my loan and interest will accrue on the on the amount of this difference at the Initial Stated Rate.

    **(F)**    **Limit on My Unpaid Principal Balance; Increased Monthly Payment**

    During the Initial Period, the unpaid Principal balance of the loan can never exceed a maximum amount equal to 120.000 % of the Principal amount originally borrowed. In the event the unpaid Principal would otherwise exceed that 120.000 % limitation, the Note Holder will determine the amount of the monthly payments based on the amount sufficient to repay the interest that accrues on the Principal balance of the loan (including previously accrued, unpaid and capitalized interest) at the Initial Stated Interest Rate. This amount will be my new minimum monthly payment until the first Payment Change Date.

    **(G)**    **Calculation of Payment Changes and Payment Amounts after Initial Period until Month 121**

    After the Initial Period, changes in my monthly payment will reflect changes in the unpaid Principal of my loan and the interest rate that I must pay. My monthly payment may change on the first Payment Change Date, and on the first day of every month thereafter.

    Except as provided in Section 4(H) of this Note, beginning on the first Payment Change Date and the first day of each month thereafter my monthly payment will be based on the amount sufficient to repay the interest that accrues on the Principal balance of the loan at the interest rate that will become effective on the immediately prior Change Date. Except as provided in Section 4(H) of this Note, I will make monthly payments in the amounts as calculated in this Section 4(G) until the next Payment Change Date.

    **(H)**    **Calculation of Payment Changes and Payment Amounts from Month 121 until Maturity Date**

    Beginning with the monthly payment due on ___September 1st, 2017___, and for each monthly payment due thereafter until the Maturity Date of the loan, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected Principal balance of the loan in full on the Maturity Date at the interest rate that becomes effective on each Change Date. Until the Maturity Date, I will make monthly payments in the amounts as calculated in this Section 4(H) until the next Payment Change Date.

    **(I)**    Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

(A)    Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of ____15____ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be ___5.000__% of my overdue payment of Principal and interest, as applicable. I will pay this late charge promptly but only once on each late payment.

(B)    Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)    Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)    No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)    Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor.

AHM-2062N(MULT.TX(02/07)
(page 3 of 4 pages)

5 Year Stated Rate, Payment Options, ADJUSTABLE RATE NOTE (One Month Libor)
Doc # 946764/946764 .prn    Appß 0001830456

"Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender shall not exercise this option if Applicable Law prohibits such exercise. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | | |
|---|---|---|
| _____ (Seal) | | _____ (Seal) |
| ANGELA SACCHI -Borrower | | ROBERT SACCHI -Borrower |
| _____ (Seal) | | _____ (Seal) |
| -Borrower | | -Borrower |
| _____ (Seal) | | _____ (Seal) |
| -Borrower | | -Borrower |
| _____ (Seal) | | _____ (Seal) |
| -Borrower | | -Borrower |

*[Sign Original Only]*

AHM-2062MQMULT)(02/07)
*(page 4 of 4 pages)*

5 Year Stated Rate, Payment Option, ADJUSTABLE RATE NOTE (One Month Libor)
Doc # 946765/946765.prn    App# 0001830456

# EXHIBIT C

COMMONWEALTH LAND
Recording Request

COH #N

Return To:
American Brokers Conduit
4650 Regent Blvd., Suite 100
Irving, TX 75063-2250

07/25/07

**20071753960**

Prepared By:
Ernesto Andrade Cortes
6800 Owensmouth Avenue
Suite 180
Canoga Park, CA
91303
5081071p-p
5511p-019-010

——————— [Space Above This Line For Recording Data] ———————

# DEED OF TRUST

MIN 100024200016304564

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated July 16, 2007
together with all Riders to this document
(B) "Borrower" is ANGELA SACCHI and ROBERT SACCHI, Wife and Husband as
Joint Tenants

Borrower is the trustor under this Security Instrument
(C) "Lender" is American Brokers Conduit

Lender is a Corporation
organized and existing under the laws of State of New York

DOC #:323543                          APPL #:0002330486
CALIFORNIA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3005 1/01

-6A(CA) (0005) 01
Page 1 of 15        DCL 3005 01·        Initials

VMP MORTGAGE FORMS - (800)521-7291

Lender's address is 538 Broadhollow Road, Melville, NY 11747

(D) "Trustee" is LandAmerica Commonwealth

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated July 16, 2007
The Note states that Borrower owes Lender Eight Hundred Twenty Five Thousand and No/100 Dollars
(U.S. $825,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than August 1, 2037

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

PREPAYMENT RIDER

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

DOC #:334542                    APPL #:0003830456

-6A(CA) (0205).01                    Page 2 of 15          Initials: _____          Form 3005  1/01

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Los Angeles

    [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

See Prelim

Parcel ID Number: 5516-019-010                which currently has the address of
203 North Gramercy Place                                  [Street]
Los Angeles                       [City], California 90004      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

DOC #:324543              APPL #:0001830486

                                         Initials:

-6A(CA) (0207).01             Page 3 of 15                       Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

DOC #:324544                    APPL #:0001830456

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

DOC #:324545                    APPL #:0001830455

-6A(CA) (0005).01              Page 5 of 15              Initials: _____     Form 3005  1/01

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

DOC #:324546　　APPL #:0001830456

-6A(CA) (0005).01　　Page 6 of 15　　Initials: _____　　Form 3005 1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

DOC #:324547

APPL #:0001830456

-6A(CA) (0205).01

Page 7 of 15

Initials: _____

Form 3005 1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage

DOC #:324548                                                    APPL #:0001830456

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

DOC #:324549                                  APPL #:0001830456



any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict

DOC #:324550      APPL #:0001830456

 -6A(CA) (0005).01

Initials: _____

Page 10 of 15

Form 3005  1/01

shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

DOC #:324551

APPL #:0003830456

-6A(CA) (0005).01

Page 11 of 15

Initials:

Form 3005 1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

DOC #:324552                    APPL #:0001830456

Initials: _____

-6A(CA) (0505).01                    Page 12 of 15                                Form 3005  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                                    ANGELA SACCHI                      -Borrower


_____          _____ (Seal)
                                                    ROBERT SACCHI                      -Borrower


_____ (Seal)               _____ (Seal)
                     -Borrower                                                         -Borrower


_____ (Seal)               _____ (Seal)
                     -Borrower                                                         -Borrower


_____ (Seal)               _____ (Seal)
                     -Borrower                                                         -Borrower


DOC #:324554                    APPL #:0001830456                    Form 3005  1/01
-6A(CA) (0005).01                 Page 14 of 15

State of California
County of Los Angeles

} ss.

On                                         before me,                                                    personally appeared

ANGELA SACCHI and ROBERT SACCHI

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

DOC #:324555                    APPL #:0001830456

                                              Initials: _____        Form 3005  1/01

⊗-6A(CA) (0205).01              Page 15 of 15

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R Part 3500); as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

County       of Los Angeles
[Type of Recording Jurisdiction]       [Name of Recording Jurisdiction]
See Exhibit A

## SEE EXHIBIT A

Parcel ID Number 5516-019-019       which currently has the address of
203 North Gramercy Place       [Street]
Los Angeles       [City], California 90004    [Zip Code]
("Property Address")

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of

DOC # 324543       APPL #:0001630456

-6A(CA) (0207)01       Page 3 of 15       Initials _____ _____       Form 3005 1/01

07 1715365

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement, (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded, or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

DOC # 324545                    APPL # 0016034156

_____ -6A(CA) (0502).01                    Page 3 of 15                    Initials _____    Form 3005 1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due

**6.** Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.** Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause

**8.** Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.** Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument (b) appearing in court, and (c) paying reasonable

DOC # 326547                APPL # 0001830456

-6A(CA) 0000 01         Page 7 of 15

Initials _____    Form 3005 1/01

Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or

DOC # 324849                                                ADRL 6 5080.9104548

shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument, (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred, (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender (a) cash, (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity, or (d) Electronic Funds Transfer Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

DOC #:124651

APPL # 0001630456

MERS-4A(CA) (0507).01

Page 11 of 15

Form 3005 1/01

07 1753960

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California

DOC #1324585

APPL #:0002830456

Form 3005 1/01

@D-6A(CA) (0005) 01

Page 11 of 15

07 1759960

# EXHIBIT D

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO
Fidelity National Title Company
17592 E. 17th Street, Suite 300.
Tustin , CA 92780

Trustee Sale No. 10-09908-6

Space above this line for recorder's use only
Loan No. 2000177353

## SUBSTITUTION OF TRUSTEE
Affidavit attached

WHEREAS, ANGELA SACCHI and ROBERT SACCHI, Wife and Husband as Joint Tenants, was the original Trustor, LANDAMERICA COMMONWEALTH, was the original Trustee, and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR AMERICAN BROKERS CONDUIT, was the original Beneficiary under that certain Deed of Trust dated July 16, 2007, and recorded July 25, 2007 as Instrument Number 20071753960 of Official Records in the Office of the Recorder of Los Angeles County, California;

WHEREAS, the undersigned current Beneficiary of the Deed of Trust desires to substitute a new Trustee under said Deed of Trust;

Now, THEREFORE, the undersigned hereby substitutes Fidelity National Title Company, whose address is 17592 E. 17th Street, Suite 300, Tustin, CA 92780, as Trustee under said Deed of Trust.

DATE: 11/17/10

By: RESIDENTIAL CREDIT SOLUTIONS, INC.

By

STATE OF T/x/05

COUNTY OF Tarrant

On 11/17/10, before me, Shaun Denise Rives, a Notary Public, personally appeared Robert William Garden, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of Texas that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature Shaun Denise Rives       (Seal)

SHAUN DENISE RIVERS
My Commission Expires
May 27, 2013

# Fidelity National Title Company

### AFFIDAVIT OF MAILING

T.S. No. 10-09908-6

I declare that I am over the age of 18 years, and that my business address is 17592 E. 17th Street, Suite 300, Tustin, CA 92780.

A copy of the attached Substitution of Trustee was mailed to all those persons required by California Civil Code Section 2924b and in the manner required by Section 2934a[b].

Date: 01/03/2010

Signed:_____
          Juan Enriquez

# EXHIBIT E

When Recorded Mail To:

Fidelity National Title Company
17592 E. 17th Street, Suite 300
Tustin, CA 92780

Trustee Sale No. 10-09908-6 .          Loan No. 2000177353      Title Order No. 542300

APN 5516-019-010

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED July 16, 2007. UNLESS YOU
TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF
YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU,
YOU SHOULD CONTACT A LAWYER.**

On January 26, 2011, at 10:30 AM, at the west side of the Los Angeles County Courthouse, directly facing Norwalk
Blvd., 12720 Norwalk Blvd., Norwalk, CA,Power Default Services, Inc., as the duly appointed Trustee, under and
pursuant to the power of sale contained in that certain Deed of Trust Recorded on July 25, 2007, as Instrument No.
20071753960 of Official Records in the office of the Recorder of Los Angeles County, CA , executed by: ANGELA
SACCHI and ROBERT SACCHI, Wife and Husband as Joint Tenants, as Trustor, in favor of MORTGAGE
ELECTRONIC REGISTRATION SYSTEMS, INC as Beneficiary, WILL SELL AT PUBLIC AUCTION TO THE
HIGHEST BIDDER, in lawful money of the United States, all payable at the time of sale, that certain property
situated in said County, California describing the land therein as:

AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

The property heretofore described is being sold "as is". The street address and other common designation, if any,
of the real property described above is purported to be:

203 NORTH GRAMERCY PLACE, LOS ANGELES, CA

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common
designation, if any, shown herein.

Said sale will be made without covenant or warranty, express or implied, regarding title, possession, or
encumbrances, to pay the remaining unpaid balance of the obligations secured by and pursuant to the power of sale
contained in that certain Deed of Trust (together with any modifications thereto).

The total amount of the unpaid balance of the obligations secured by the property to be sold and reasonable



estimated costs, expenses and advances at the time of the initial publication of this Notice of Trustee's Sale is estimated to be $901,832.54 (Estimated), provided, however, prepayment premiums, accrued interest and advances will increase this figure prior to sale. Beneficiary's bid at said sale may include all or part of said amount. In addition to cash, the Trustee will accept a cashier's check drawn on a state or national bank, a check drawn by a state or federal credit union or a check drawn by a state or federal savings and loan association, savings association or savings bank specified in Section 5102 of the California Financial Code and authorized to do business in California, or other such funds as may be acceptable to the trustee. In the event tender other than cash is accepted, the Trustee may withhold the issuance of the Trustee's Deed Upon Sale until funds become available to the payee or endorsee as a matter of right. The property offered for sale excludes all funds held on account by the property receiver, if applicable.

DATE: 01/03/2010

POWER DEFAULT SERVICES, INC., Trustee
By: Fidelity National Title Company, its agent 17592 E. 17th Street, Suite 300, Tustin , CA 92780, 714-508-5100

By: _____
     Juan Enriquez, Authorized Signature

The undersigned mortgagee, beneficiary or authorized agent for the mortgagee or beneficiary pursuant to California Civil Code § 2923.52(c) declares that the mortgagee, beneficiary or the mortgagee's or beneficiary's authorized agent has obtained an exemption from the state regulator that is current and valid and the additional 90 day period does not apply. This loan servicer has implemented a comprehensive loan modification program that meets the requirements of civil code section California Civil Code § 2923.53.

Regarding the property that is the subject of this notice of sale, the "mortgage loan servicer" as defined in Civil Code § 2923.53(k)(3) declares that it has obtained from the Commissioner a final or temporary order of exemption pursuant to Civil Code section 2923.53 that is current and valid on the date this notice of sale is recorded. The time frame for giving a notice of sale specified in Civil Code Section 2923.52 subdivision (a) does not apply to this notice of sale pursuant to Civil Code Sections 2923.52.

Fidelity National Title Company, as Agent for the mortgage loan servicer as defined under California Civil Code section 2923.53 (k)(3)

By: _____
     Juan Enriquez, Authorized Signature

SALE INFORMATION CAN BE OBTAINED ON LINE AT www.lpsasap.com AUTOMATED SALES INFORMATION PLEASE CALL 714-730 - 2727

# EXHIBIT F

Jah 20 11 12:50p    The Mail Shoppe    3234661035    p.9

Recording Requested By
and When Recorded Mail to:

Default Resolution Network
17592 E. 17th Street, Suite 300
Tustin, CA 92780

| COPY of Document Recorded | 7113 8257 1474 5108 2569 |
|---|---|
| at    **Los Angeles** | County Recorder |
| 10 1101452 | 08/09/2010 |
| has not been compared with original. | |
| Original will be returned when process has been completed. | |

Fee: 21.00   DTT:  0.00   Total:  21.00

Trustee Sale No: 10-09908-6.
Loan No: 0031858962

# NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

## IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is $14,413.03 as of August 5, 2010, and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition to reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the end of the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact :



American Home Mortgage Servicing, Inc.
4875 Belfort Road Suite 130
Jacksonville, FL 32256
Phone: 877-304-3100 REF# 0031858962 .

If you have any questions, you should contact a lawyer or the governmental agency which
may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you
may offer your property for sale, provided the sale is concluded prior to the conclusion of the
foreclosure.

REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT
ACTION. NOTICE IS HEREBY GIVEN THAT: Default has been declared under a Deed of
Trust dated as of July 16, 2007, executed by ANGELA SACCHI and ROBERT SACCHI, Wife and
Husband as Joint Tenants, as trustor (the "Original Trustor"), to secure obligations in favor of
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR AMERICAN
BROKERS CONDUIT, as beneficiary, recorded on July 25, 2007, as Instrument No.
20071753960 of Official Records in the office of the Recorder of Los Angeles County,
California (the "Original Deed of Trust"), and that

The Deed of Trust encumbers certain property more particularly described therein (the "Trust
Property"), and that

The Deed of Trust secures the payment of and the performance of certain obligations,
including but not limited to, the obligations set forth in a promissory note(s) with a face
amount of $825,000.00, and that

A breach of, and default in, the obligations for which said Deed of Trust is security has
occurred in that the trustor has failed to perform obligations pursuant to or under the Note
and/or the Deed of Trust, specifically: failed to pay payments which became due; together
with late charges due; and that

By reason thereof, the Beneficiary has declared and does hereby declare all sums secured
thereby immediately due and payable and has elected and does hereby elect to cause the
Trust Property to be sold to satisfy the obligations secured thereby.

The mortgagee, beneficiary or authorized agent for the mortgagee or beneficiary pursuant to
California Civil Code § 2923.5(c) declares that the mortgagee, beneficiary or the mortgagee's
or beneficiary's authorized agent has either contacted the borrower or tried with due diligence
to contact the borrower as required by California Civil Code § 2923.5.

Date: August 9, 2010

Default Resolution Network
Agent for the Beneficiary By: ServiceLink, its Agent
Through ServiceLink as agent, through SPL Inc, as authorized agent.

By: