Vito Torchia, Jr. (SBN 244687)
torchiav@brookstone-law.com
Deron Colby (SBN 196686)
dcolby@brookstone-law.com
Aalok Sikand (SBN 248165)
asikand@brookstone-law.com
**BROOKSTONE LAW, PC**
4000 MacArthur Blvd., Suite 1110
Newport Beach, California 92660
Telephone: (800) 946-8655
Facsimile: (866) 257-6172

Attorneys for Plaintiffs ANGELA SACCHI and ROBERT SACCHI

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELA SACCHI, an individual; and ROBERT SACCHI, an individual, | Case No.: CV 11-01658 AHM (CWx) |
| Plaintiffs, | [*Assigned to the Honorable A. Howard Matz, Courtroom 14*] |
| vs. | **PLAINTIFFS ANGELA SACCHI AND ROBERT SACCHI'S NOTICE OF EX PARTE AND APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ANGELA SACCHI; DECLARATION OF WILLIAM MCCAFFREY.** |
| MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware corporation, as nominee for AMERICAN HOME MORTGAGE CORPORATION d/b/a AMERICAN BROKERS CONDUIT; AMERICAN HOME MORTGAGE SERVICING, INC., a Delaware corporation; AMERICAN HOME MORTGAGE CORPORATION d/b/a AMERICAN BROKERS CONDUIT, a New York corporation; RESIDENTIAL CREDIT SOLUTIONS, INC., a Delaware corporation; FIDELITY NATIONAL TITLE COMPANY d/b/a DEFAULT RESOLUTION NETWORK, a California corporation; DEFAULT | Action Filed:  January 21, 2011 Action Removed:  February 24, 2011 Trial Date:  None Set |

- 1 -

RESOLUTION NETWORK, an
unknown entity; POWER DEFAULT
SERVICES, Inc., a Texas Corporation;
LANDAMERICA
COMMONWEALTH, an entity of
unknown form; and DOES 1 to 1000,
inclusive,

                    Defendants.

Plaintiffs ANGELA SACCHI and ROBERT SACCHI, and each of them ("Plaintiffs"), hereby apply for issuance of an *Ex Parte* Temporary Restraining Order ("TRO") precluding Defendants AMERICAN HOME MORTGAGE SERVICING, INC., POWER DEFAULT SERVICES, INC., RESIDENTIAL CREDIT SOLUTIONS, INC., and MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC. (collectively, "Defendants") and each and all of its agents, servants, and employees, and all persons acting under, in concert with, or for them, from:

    1)    Proceeding with the trustee sale of Plaintiffs' Property now scheduled for March 28, 2011;

    2)    Otherwise attempting in any manner to dispossess Plaintiffs from possession of the Property commonly known as **203 N. Gramercy Place, Los Angeles, California 90004** (the "Property"), and legally described in **Exhibit A** to the First Amended Complaint; or

    3)    Taking any action to enforce any other remedy purportedly provided to them by the purported Deed of Trust identified below, including, but not limited to, the exercise of any Power of Sale provisions, without prior Order of this Court, pending a hearing on Plaintiffs' application for a Preliminary Injunction herein.

Plaintiffs further apply for an Order to Show Cause why a Preliminary Injunction should not issue enjoining said Defendants, and each and all of their

*EX PARTE* **APPLICATION FOR TRO, ETC.**

agents, servants and employees, and all persons acting under, in concert with, or for them, from taking any of the foregoing actions without prior order of this Court, pending the adjudication of Plaintiffs' claims in this Action on the merits.

This Application is made on the grounds that:

1) Great and irreparable injury to Plaintiffs will result if Defendants, and each and all of their agents, servants and employees, and all persons acting under, in concert with, or for them, are not restrained as requested;

2) Enjoining the sale would not result in harm to the party claiming to the beneficiary of the Note because that party does not actually own the Note and there has been a defect in the foreclosure process, including, but not limited to, the trustee's failure to comply with California Civil Code §2923.5 *et seq.*, which renders an foreclosure sale a legal nullity;

3) That based on the moving papers including the declarations of Plaintiff ANGELA SACCHI and William McCaffrey, there is a reasonable likelihood that Plaintiffs will prevail on the merits of their claims at trial;

4) That pursuant to California Civil Code §2923.5 and pursuant to the case of Mabry v. Superior Court (2010) 185 Cal. App. 4th 208, the Trustee Sale is improper and should be enjoined because Defendants did not meet with Plaintiffs to assess Plaintiffs' financial situation and explore options for the borrower to prevent foreclosure before filing the Notice of Default. Pursuant to §2923.5, if the lender fails to meet these statutory requirements, there is no valid Notice of Default and without a valid Notice of Default a foreclosure sale cannot proceed;

*EX PARTE* APPLICATION FOR TRO, ETC.

5)   To preserve the status quo pending a disposition of this action on its merits and to allow Defendants to meet their statutory duty to comply with California Civil Code §2923.5;

6)   Pecuniary compensation would not afford adequate relief and it would be extremely difficult to ascertain any amount of compensation which would afford adequate relief;

7)   The restraining order and injunction are necessary to prevent a multiplicity of legal actions, including an unlawful detainer action, including appeals, this separate lawsuit, and possible bankruptcies; and

8)   On the further grounds that the orders sought are necessary in that without them any award which Plaintiffs may ultimately obtain may be rendered ineffectual; and because the balance of hardships clearly favors Plaintiffs, an elderly married couple whose lives would be devastated by Defendants' illegal removal of them from their home. (CCP §§526-527).

The Application is based upon the First Amended Complaint for: (1) Cancellation of Deeds; (2) Slander of Title; (3) Injunctive Relief; (4) Violation of California Civil Code §2923.5; and (5) Unlawful, Unfair and Fraudulent Business Practices (the "Complaint"), the Memorandum of Points and Authorities and Declarations of Plaintiff ANGELA SACCHI and William McCaffrey, attached hereto, and upon such other evidence, documentary or judicially noticeable, as may be presented to the Court.

Dated:  March 25, 2011

BROOKSTONE LAW, PC

By:   /s/ - Deron Colby
         Deron Colby
         Vito Torchia, Jr.
         Aalok Sikand
         Attorneys for Plaintiffs

- 4 -

*EX PARTE* APPLICATION FOR TRO, ETC.

1

## **TABLE OF CONTENTS**

2   I.      INTRODUCTION…..……………………………………………….- 5 -

3   II.    STATEMENT OF FACTS………..…………………………….- 5 -

4   III.   A PRELIMINARY INJUNCTION IS BOTH NECESSARY AND

5         APPROPRIATE IN THIS ACTION UNDER THE APPLICABLE LEGAL

6         STANDARDS ……………………………………..………………….- 5 -

7   A.    Plaintiffs Will Suffer Irreparable Injury  If Defendants Are Not

8         Restrained…………………………………..…………………………- 5 -

9         B.     Plaintiffs Have Shown That There Is A Reasonable Likelihood That

10              They Will Prevail On The Merits…………………………………...-8-

11              i.)    Defendants have failed to meet their statutory obligations under

12                    California Civil Code §2923.5…………………………………-8-

13              ii.)   The party attempting to foreclose here never owned the Note and

14                    therefore cannot foreclose…………………………………-10-

15              iii.)  The Deed of Trust and Note have been "separated" and each have

16                    taken distinctly different paths, in violation of California Civil

17                    Code §2936……………………………………………....-11-

18   VI. CONCLUSION………..……………………………………….- 5 -

19

20

21

22

23

24

25

26

27

28

*EX PARTE* **APPLICATION FOR TRO, ETC.**

# TABLE OF AUTHORITIES

## CASES

*Adler v. Sargent* (1895) 109 Cal. 42 ....................................................- 15 -

*Bellistri, supra,* 284 S.W.3d at 624......................................................-14-

*Carpenter v. Longan* (1872) 83 U.S. 271 ..................................- 12, 13 -

*Continental Baking Co. v. Katz* (1968) 68 Ca1.2d 512 ......................- 8 -

*In re: Foreclosure Cases* (S.D. Oh. 2007) 521 F. Supp. 2d 650 ................- 1 -, - 6 -

*In re: Vargas* (C.D. Cal. 2008) 396 B.R. 511...........................- 9 -, - 14 -

*Landmark National Bank v. Kesler* (2009) 289 Kan. 528 ............................- 9, 13 -

*Lenard v. Edmonds* (1957) 151 Cal. App. 2d 764 ...............................- 8 -

*People v. Black's Food Store* (1940) 16 Ca1.2d 59.............................- 8 -

*Seidell v. Tuxedo Land Co.* (1932) 216 Cal. 165 ...............................- 15 -

*Smith v. Smith* (1942) 49 Cal. App. 2d 716 ........................................- 7 -

*State Board of Barber Examiners v. Star* (1970) 8 Cal. App. 3d 736 .................- 7 -

*Wind v. Herbert* (1960) 186 Cal. App. 2d 276 ...................................- 7 -

## STATUTES

Cal. Civ. Code §2923.5…………………………………………-9-, -10-

Cal. Civ. Code §2936...............................................................-12-

Cal. Code of Civ. Procedure §526 ..........................................- 6 -

California Code of Civil Procedure §527 ............................................- 7 -

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

This case is a classic example of how the lending industry took shortcut after shortcut after shortcut, without regard to the borrower. The statutory scheme was enacted for a reason; namely, to protect the borrower. Defendants here have not and did not follow the statutory scheme. Despite the non-compliance, Defendants seek to take Plaintiffs' home. Plaintiffs are an elderly couple that just wants to stay in their home and have the opportunity to try and work something out with their lender. Defendants wish to deny them that opportunity.

If Defendants are not restrained and prevented from taking Plaintiffs' homw, Plaintiffs will suffer undue and unnecessary hardship and emotional distress, for which no concomitant prejudice will be suffered by the Defendant, if the pending foreclosure sale of the Property is not immediately restrained. Accordingly, Plaintiffs respectfully request the issuance of a Temporary Restraining Order enjoining Defendants, their agents, representatives, and employees, and anyone acting in concert with or on their behalf, from completing the foreclosure sale of the Property, **now scheduled for March 28, 2011**, pending a hearing on the issuance of a Preliminary Injunction herein.

### II.   STATEMENT OF FACTS

On or about July 16, 2007, Plaintiffs executed in favor of defendant AMERICAN BROKERS CONDUIT ("ABC") a certain "ADJUSTABLE RATE NOTE" (the "Note") in the original principal sum of $825,000.00, payable with interest as provided in the Note.  A true and correct copy of the Note is marked as **Exhibit B** to the Sacchi declaration and incorporated herein by this reference.  Said Note was purportedly secured by a Deed of Trust of the same date executed by Plaintiffs, as Trustors, in favor of defendant MORTGAGE ELECTRONIC

- 1 -

REGISTRATION SYSTEMS, INC. ("MERS"), ostensibly as the "beneficiary" of the Deed of Trust, and defendant LandAmerica as Trustee. A true and correct copy of the Deed of Trust, recorded in the Official Records of the County of Los Angeles, State of California on July 25, 2007, as Instrument No. 2007-1753960, is marked as **Exhibit C** to the Sacchi declaration and incorporated herein by this reference. [See Sacchi decl., ¶4.]

On or about January 3, 2010, a "Juan Enriquez" signed a document entitled "Fidelity National Title Company—Affidavit of Mailing," on behalf of defendant FIDELITY, wherein Mr. Enriquez "declares," presumably under penalty of perjury, that "A copy of the ***attached Substitution of Trustee*** was mailed to all those persons required by California Civil Code Section 2924b and in the manner required by Section 2934a[b]" (emphasis added). The "attached Substitution of Trustee," which specifically references Mr. Enriquez's Affidavit, is the Substitution of Trustee signed by defendant RCS on November 17, 2010 and recorded on January 6, 2011. The Substitution of Trustee, again signed over 11 months ***after*** Mr. Enriquez's affidavit, substitutes defendant FIDELITY in as trustee for the original trustee, defendant LandAmerica. In short, at the time defendant FIDELITY's agent, Mr. Enriquez, signed the statutorily required affidavit attesting that the mailing of the Substitution of Trustee occurred according to the law, the document that was allegedly mailed had not even been signed and would not be signed and recorded for almost one year. As such, the Substitution of Trustee substituting defendant FIDELITY in as trustee is fatally defective and did not and could not have conferred the authority on FIDELITY to foreclose on the Property. A true and correct copy of the purported Substitution of Trustee, including the attached Affidavit, is attached as **Exhibit D** to the Sacchi declaration. [See Sacchi decl., ¶5.]

Also on or about January 3, 2010, Mr. Enriquez, on behalf of defendant PDS, as "Trustee, By: Fidelity National Title Company, its agent…," signed a

*EX PARTE* **APPLICATION FOR TRO, ETC.**

Notice of Trustee's Sale ("NTS") wherein the sale of the Property was set for
January 26, 2011.  The NTS was recorded on January 6, 2011, over one year *after*
Mr. Enriquez signed the NTS.  The NTS was signed prior to any default by
Plaintiffs, prior to any service or recording of a Notice of Default ("NOD") and
prior to the ripening of any of the defendants' right to begin foreclosure
proceedings against Plaintiffs.  As such, the NTS was a legal nullity, extinguishing
defendants' rights to foreclose on Plaintiffs.  A true and correct copy of the Notice
of Trustee Sale is attached as **Exhibit E** to the Sacchi declaration. [See Sacchi
decl., ¶6.]

On or around May of 2010, many months *before* defendant FIDELITY was
substituted in as Trustee but *after* defendant FIDELITY signed the NTS, Plaintiffs
began experiencing financial hardship and for the first time fell behind in their
mortgage payments.  At or around this time, Plaintiffs were approached by two
affiliated companies named U.S. Loan Auditors and My U.S. Legal Services, Inc.
(collectively "USLA").  Plaintiffs were told that if they paid the USLA $8,000 plus
$1,400 a month that USLA would force Plaintiffs' lender to grant relief in the form
of a principal reduction and/or loan modification.  Plaintiffs paid USLA $8,000
and authorized USLA to withdraw $1,400 from their bank account.  Around this
same time, Plaintiffs were contacted by a "Jay Severs" who purportedly worked for
AHMSI.  Mr. Severs explained that he could help Plaintiffs and possibly get the
principal balance of Plaintiffs' loan reduced.  Plaintiffs told Mr. Severs that they
had hired USLA to negotiate with AHMSI and provided USLA's information to
Mr. Severs.  Plaintiffs never heard from AHMSI again. [See Sacchi decl., ¶8.]

After 4 months of paying $1,400 a month, no return phone calls, no contact
and no results, Plaintiffs stopped paying USLA.  During this period of time,
Plaintiffs were unable to pay their mortgage.  Plaintiffs later learned that USLA
filed for bankruptcy.  Plaintiffs received a document indicating that they could

*EX PARTE* **APPLICATION FOR TRO, ETC.**

1    make a claim against USLA in bankruptcy court for the fees they paid.  [See

2    Sacchi decl., ¶9.]

3        On or about August 9, 2010, defendant DEFAULT RESOLUTION

4    NETWORK  ("DRN"), designated as "agent for the Beneficiary by ServiceLink,

5    its agent, through ServiceLink, as agent, through SPL Inc., as authorized agent,"

6    recorded a Notice of Default ("NOD") on Plaintiffs' Property.  Plaintiffs are

7    informed and believe that defendant DRN is a division of FIDELITY.  A true and

8    correct copy of the Notice of Default is attached as **Exhibit F** to the Sacchi

9    declaration and incorporated herein by this reference.  Prior to the filing of the

10   NOD, none of the defendants made any effort to contact Plaintiffs for purposes of

11   assessing Plaintiffs' financial situation and explore options for Plaintiffs to avoid

12   foreclosure. [See Sacchi decl., ¶7.]

13       On or about November 17, 2010, Jeffrey Gideon, on behalf of defendant

14   RESIDENTIAL CREDIT SOLUTIONS ("RCS"), signed a Substitution of Trustee

15   purporting to substitute defendant FIDELITY in as the new trustee under the Deed

16   of Trust.  However, there is no recording documenting that MERS assigned the

17   Deed of Trust to RCS.  As referenced earlier, the Assignment of the Deed of Trust

18   assigning the Deed of Trust and Note to RCS was not signed until over one month

19   later.  Thus, at the time of this transaction, RCS had no beneficial interest in the

20   property and furthermore had no legitimate power to substitute FIDELITY in as

21   the new trustee.  The Substitution of Trustee was recorded on January 6, 2011.

22   [See Sacchi decl., ¶5.]

23       On or about December 22, 2010, Jeffrey Gideon, who in November of 2010

24   signed the Substitution of Trustee on behalf of RCS, signed, on behalf of defendant

25   MERS this time, an Assignment of Deed of Trust wherein defendant MERS

26   assigned its rights to the Deed of Trust and Note underlying Plaintiffs' loan to

27   defendant RCS.  The Assignment of Deed of Trust was also recorded on January 6,

28   2011.  At the time of the aforementioned assignment, defendant MERS did not

- 4 -

***EX PARTE* APPLICATION FOR TRO, ETC.**

possess the requisite power, authority and interest to make the assignment. [See Sacchi decl., ¶11.]

Finally, the third recording to occur on January 6, 2011, was the NTS.  As mentioned earlier, the NTS was signed by Mr. Enriquez, on behalf of defendant FIDELITY, over one year before the actual NTS was recorded.  Defendant PDS, as Trustee by defendant FIDELITY, recorded the NTS which scheduled a trustee's sale for January 26, 2011.  For the reasons stated herein, neither defendant POWER DEFAULT SERVICES ("PDS") nor defendant FIDELITY had the authority, ostensible or otherwise, to sign and record the NTS.  As such, the NTS is a legal nullity. [See Sacchi decl., ¶6.]

On or about January 14, 2011, Plaintiffs attempted to contact defendant AHMSI but to no avail.  Plaintiffs were informed that they would have to communicate with defendant RCS.  Plaintiffs had no idea who owned the Note underlying their mortgage or who to communicate with.  Plaintiffs eventually got a hold of defendant RCS.  The contact was brief and very terse.  Defendant RCS' representative, "Junie," was very rude, not helpful and explained to Plaintiffs that there was nothing that defendant RCS could do, that only the "lender" or "investor" could modify the loan, and that defendant RCS had no power to do so. Plaintiffs were never provided with information as to who the mysterious "investor" was. [See Sacchi decl., ¶11.]

## III.  A PRELIMINARY INJUNCTION IS BOTH NECESSARY AND APPROPRIATE IN THIS ACTION UNDER THE APPLICABLE LEGAL STANDARDS

California Code of Civil Procedure ("CCP") §526 provides for injunctive relief in seven different circumstances. The situation in which Plaintiffs find themselves merits injunctive relief in at least several of those categories.

- 5 -

Accordingly, a Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction is appropriate.  [CCP §527.]

### A. **Plaintiffs Will Suffer Irreparable Injury If Defendants Are Not Restrained.**

An injunction may be granted when it appears by the Complaint or affidavits that the commission or continuance of some act during the litigation would produce great or irreparable injury to a party to the action.  [*Smith v. Smith* (1942) 49 Cal. App. 2d 716, 718-719.]  The term "irreparable injury" means that species of damage, whether great or small, that ought not to be submitted to on the one hand or inflicted on the other.  [*Wind v. Herbert* (1960) 186 Cal. App. 2d 276, 285.]  In short, "[t]he court considers who will bear the greater injury should the preliminary injunction be granted and whether a reasonable probability exists the plaintiff will prevail."  [*State Board of Barber Examiners v. Star* (1970) 8 Cal. App. 3d 736, 738.]

Again, allowing the impending foreclosure sale of the Property to proceed will wrongfully dispossess Plaintiffs and their family of their right to possess the Property, displace them from their home, and will subject Plaintiffs and their family to unwarranted and unnecessary humiliation and emotional distress as a result of their wrongful eviction from the Property.  Particularly since real property is deemed to be unique in California, this is a "species of damage" to which Plaintiffs should not, and need not, be subjected. Indeed, it is hard to conceive of injury which, by its very nature, is more irreparable and harmful, than the ouster of a family from their home. The fact that the lender and the other defendants here clearly have "unclean hands" in the procurement of the underlying loan, adds insult to injury. And very few lenders now are even continuing to use the MERS system and have all but abandoned it due to its very publicly declared legal deficiencies. Even MERS has come out and demanded that not of its "member servicers" foreclose in its name.

- 6 -

An injunction may also be granted when it appears during the litigation that a party is doing, or is threatening to do, some act respecting the subject of the action tending to render any ultimate judgment ineffectual. *Lenard v. Edmonds* (1957) 151 Cal. App. 2d 764, 769. Allowing Defendants to bring the Property to a foreclosure sale when Defendants have not met their statutory obligations will cause immediate harm to Plaintiffs, tending to render any judgment in their favor ineffectual, since once dispossessed it is unlikely that Plaintiffs will ever be restored to possession. Moreover, Plaintiffs' family home may be resold to a stranger or bona fide purchaser for good value, and even if it is not, reconveying title and ownership to Plaintiffs would be very convoluted and difficult, if not impossible. And the Sacchi family, having been already forced onto the street or some other unknown place, moving back in, months or years later, would be practically impossible in many ways and for many reasons, not to mention all t he costs involved and the other inherent difficulties.

Conversely, Defendants would suffer little, if any, harm, from being forced to postpone a foreclosure sale date, and certainly no irreparable injury. Defendants have not met their statutory obligations. They should not be permitted to foreclose until those obligations are met. The foreclosure could always occur at a later date. And with so many properties in foreclosure (some estimates are between 75 to 150 million), most homes do not sell, after a foreclosure, for a long time anyway, and then after numerous price drops, and for much less than the amount of the loans on the property. And it's easy to reschedule a sale date, with many lenders apparently not even giving any notice of the new date under the terms of their loan documents.

Lastly, a Preliminary Injunction may issue to preserve the status quo until a final determination of the merits of the action. [*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528; *People v. Black's Food Store* (1940) 16 Cal.2d 59, 64.] This is particularly so where, as here, Plaintiffs seek to maintain the status

- 7 -

quo between the parties pending the outcome of this action to determine whether the very instruments on which Defendants based its entitlement to possession – the deed of Trust, and Notices of Default and Sale – constituted, or *ever* constituted, a valid lien on Plaintiffs' Property. [*See e.g. Landmark National Bank v. Kesler, supra*, 289 Kan. 528; *In re: Foreclosure Cases, supra*, 521 F. Supp. 2d 650; *In re: Vargas, supra,* 396 B.R. 511.]  Again, allowing the Defendants to obtain possession of the Property would seriously alter the relative positions of the parties, and would give the Defendants an even greater advantage over Plaintiffs, who would be left homeless and dispossessed of their family home.  It would be like trying to get the cows back in the barn after the door was left open, although in this case, real people, not cows, would be permanently out in the cold with the barn door bolted shut forever.

## B. **Plaintiffs Have Shown That There Is A Reasonable Likelihood That They Will Prevail On The Merits**.

### i) **Defendants have failed to meet their statutory obligations under California Civil Code §2923.5.**

As the declaration of Plaintiff ANGELA SACCHI makes clear, Defendants have not met their statutory responsibility under California Civil Code §2923.5 which mandates that prior to filing a Notice of Default, a foreclosing party must make a good faith effort to meet and confer with a homeowner in order to discuss options to foreclosure. The foreclosing party is required to wait 30 days after either making a good faith effort or actually meeting to file an NOD. Finally, the foreclosing party is required to record a declaration of compliance along with the NOD. Defendants have not met their obligations under California Civil Code §2923.5.

- 8 -

Effective September 26, 2008, the Perata Mortgage Relief Bill became part of the law of the State of California and added section 2923.5 to the California Civil Code to alleviate what the State Legislature called an "unprecedented threat" to the state's economy caused by the skyrocketing number of residential foreclosures.  The law requires that before filing a Notice of Default, a lender must contact a borrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure, to advise the borrower of his/her right to a meeting and to schedule a meeting with the borrowers within 14 days of initial contact. [Civil Code §2923.5(a)(2).] The law is clear: A foreclosing party may not file an NOD until 30 days after meeting the "meet and confer" requirements of §2923.5(a)(2). [§2923.5(a)(1).] Moreover, §2923.5(b) requires the recording of a declaration, attached to the NOD, that states that the foreclosing party met its obligations under §2923.5.

On or about August 9, 2010, defendant DRN, as "agent for the beneficiary by: ServiceLink, its agent through ServiceLink as Agent, through SPL Inc., as authorized agent" recorded a Notice of Default.  The Notice of Default did not include a declaration that defendants, or any of them, complied with California Civil Code §2923.5.  This is because before the Notice of Default was filed, defendants violated California Civil Code §2923.5 by failing to discuss with Plaintiffs loan modification programs or other options to avoid foreclosure.

Plaintiffs' primary intention is and at all time has been to keep the Property as their family residence. Plaintiffs' income has improved and they are ready and willing and able to make payments under a fair and reasonable permanent modification reached by the parties in a judicially supervised settlement conference. Plaintiffs merely seek an order from this Court that would force Defendants to participate in good faith in a judicially supervised settlement conference that will be deemed in full compliance with the requirements of California Civil Code §2923.5.

*EX PARTE* APPLICATION FOR TRO, ETC.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### (ii)   The party attempting to foreclose here never owned the Note and therefore cannot foreclose.

It is no secret that during the mortgage explosion, many loans were "securitized". It is also no secret that in securitizing loans, the industry cut many corners, creating a financial "bubble" that was destined to burst. Securities, backed by mortgages, were thrown into large pools without regard to the viability of any particular loan and without regard to the actual "value" of any particular loan or pool of loans. Unfortunately, many of the loans pooled into these "funds" were destined to fail. Many were "liar loans", negative amortization loans, stated income loans, loans that had no right being written and were based on intentionally inflated property values. In short, these "pools" became cesspools. From the real estate agent, to the mortgage broker, to the lender, to Wall Street, to the rating agencies, the poisonous tree was destined to drop poisonous fruit. This is the path the Note in this case took.

In the end, as the declaration of William McCaffrey makes clear, the foreclosing party never owned the Note. [McCaffrey Affidavit, ¶10.] Without repeating Mr. McCaffrey's entire declaration, the loan here was securitized and put into a Trust. However, the very terms and conditions of the Trust required that the loan make it into the Trust no later than June 1, 2007. [McCaffrey Affidavit, ¶9(A).] The Trust was prohibited from accepting any additional assets after that date. [McCaffrey Affidavit, ¶9(C).] At that time, the Sacchi's loan was in "default" and could have been accepted into the Trust as it would not have qualified as a "qualified mortgage loan". [McCaffrey Affidavit, ¶9(E).] Based on the conclusions made by Mr. McCaffrey, the foreclosing party could have never been the owner of the Note secured by the Deed of Trust because the Note did not make it into the Trust by June 1, 2007. [McCaffrey Affidavit, ¶10.]

Moreover, Mr. McCaffrey states in his declaration that there is no valid authorization to conduct a sale because defendant MERS is not a real beneficiary

- 10 -

but is an electronic registration service only. [McCaffrey Affidavit, ¶12 and see discussion under subsection (iii) hereof.] As the Court will notice, the path this loan took is very convoluted and can be confusing for even the most seasoned "loan securitization" veteran. However, the import of Mr. McCaffrey's declaration is clear: The foreclosing party does not have the right to foreclose. All Plaintiffs are requesting is that the Court force the foreclosing party to prove it has the right to foreclose.

### iii)    The Deed of Trust and Note have been "separated" and each have taken distinctly different paths, in violation of California Civil Code §2936.

California Civil Code §2936, provides: "The assignment of a debt secured by mortgage carries with it the security."  In analyzing the effect of this statute in a case in which MERS sought relief from stay to foreclose on a deed of trust in which it was named as beneficiary "acting solely as a nominee for lender and lender's successors and assigns," the Hon. Judge Samuel L. Bufford of the United States Bankruptcy Court for the Central District of California described the implications as follows:

> "A secured promissory note traded on the secondary mortgage market remains secured because the mortgage follows the note. CAL. CIV. CODE § 2936 ('The assignment of a debt secured by mortgage carries with it the security.'). California codified this principle in 1872.  Similarly, this has long been the law throughout the United States: when a note secured by a mortgage is transferred, 'transfer of the note carries with it the security, without any formal assignment or delivery, or even mention of the latter.' *Carpenter* v. *Longan,* 83 U.S. 271, 275, 21 L. Ed. 313 (1872).  Clearly, the objective of this principle is 'to keep the obligation and the mortgage in the same hands unless the parties wish to separate them.'  RESTATEMENT (THIRD) OF PROPERTY

- 11 -

(MORTGAGES) § 5.4 (1997).  The principle is justified, in tum, by reasoning that the 'the debt is the principal thing and the mortgage an accessory.' *Id.* Consequently, '[e]quity puts the principal and accessory upon a footing of equality, and gives to the assignee of the evidence of the debt the same rights in regard to both.' *Id.* Given that 'the debt is the principal thing and the mortgage an accessory,' the Supreme Court reasoned that, as a corollary, **'[t]he mortgage can have no separate existence.'** *Carpenter,* 83 U.S. at 274. For this reason, 'an assignment of the note carries the mortgage with it, **while an assignment** of the **latter alone is a nullity.'** *Id.* at 274. While the note is 'essential,' the mortgage is only "an incident" to the note. *Id.*"

[*In re: Vargas, supra,* 396 B.R. at 517-518 (bolded emphasis added**).]**

Similarly, in *Landmark National Bank v. Kesler, supra,* 289 Kan. 528, the Kansas Supreme Court considered whether MERS, again "acting solely as a nominee for lender and lender's successors and assigns," was a "contingently necessary" party without whom complete relief could not be afforded in a foreclosure suit filed by a senior lienholder.  In order to qualify as a "contingently necessary" party, Kansas law required MERS to show that it had "a meritorious defense or an interest that may be impaired." *Id.* at 535.  To determine whether MERS has such an interest, the *Landmark* Court cited the following observation of MERS purpose and operation made by the Supreme Court of Nebraska:

> "MERS is a private corporation that administers the MERS System, a national electronic registry that tracks the transfer of ownership interests and servicing rights in mortgage loans.  Through the MERS System, MERS becomes the mortgagee of record for participating members through assignment of the members' interests to MERS.  MERS is listed as the grantee in the official records maintained at county register of deeds offices. The lenders retain the promissory notes, as well as the servicing rights to the mortgages. The lenders can then

- 12 -

> sell these interests to investors without having to record the transaction in the public record. MERS is compensated for its services through fees charged to participating MERS members."

[*Id.* at 536, *citing Mortgage Elec. Reg. Sys., Inc. v. Nebraska Depart. of Banking* (2005) 270 Neb. 529, 530.]

After extensively reviewing the language of the deed of trust before it, which is identical in all material respects to the Deed of Trust executed by the Plaintiffs herein, and concluding that MERS' relationship with the lender was more of a "strawman" than a party possessing all the rights given a buyer (*Id.* at 536-540), the *Kesler* Court noted that the deed consistently referred only to rights of the lender, limiting MERS to acting "solely" as the nominee of the lender. *Id.* Most importantly for present purposes, however, the Court then went on to consider whether, as in the instant case, the separation of the "interests" of the note and the deed of trust, with the deed of trust lying "with some independent entity," rendered the mortgage unenforceable. *Id.* at 540.

Concluding that MERS had no interest sufficient to make it a "contingently necessary party," the *Kesler* Court held that the lower court had properly prevented MERS from intervening in the foreclose action commenced by the senior lienholder. Citing the Missouri Court of Appeal in *Bellistri v. Ocwen Loan Servicing, LLC* (Mo. App. 2009) 284 S.W.3d 613[1], as well as other authority, the *Kesler* Court confirmed that "[i]f MERS is only the mortgagee, without ownership of the mortgage instrument, it does not have an enforceable right." *Id.* at 541, *citing In re: Vargas, supra*, 39 B.R. at 517.[2]

---

[1] "MERS" never held the promissory note, thus its assignment of the deed of trust separate from the note had no force. *Bellistri, supra,* 284 S.W.3d at 624.

[2] In *In re: Forclosure Cases, supra,* 521 F. Supp. 2d 650, the District Court considered, among other things, whether it had diversity jurisdiction over 27 foreclosure cases pending before it, and whether the plaintiff's therein had standing to pursue the claims. With respect to the standing issue, the Court stated: "To show standing, then, in a foreclosure action, the plaintiff must show that it is the holder of the note *and the mortgage* at the time the complaint was filed. The foreclosure plaintiff must also show, at the time the foreclosure action is filed, that the holder of the note and mortgage is harmed, usually by not having received payments on the note." *Id.* at 653 (emphasis added).

1    Under these authorities, there can be little doubt but that Plaintiffs have

2 shown a more than "reasonable probability" of prevailing on the merits of their

3 claim.  As the Exhibits attached to the Sacchi declaration reveal, from the very

4 beginning the holder of the Note (AMERICAN HOME MORTGAGE

5 SERVICING, INC. "AHMSI") was "separated" from the holder of the Deed of

6 Trust (MERS), who was identified as the "beneficiary" under the Deed of Trust but

7 whose role was limited by the terms of that very Deed of Trust to acting "solely"

8 as the nominee of the lender.  These are the very circumstances noted by the *Kesler*

9 Court, the *Vargas* Court, and the California Supreme Court since as early as 1871.

10 [ *Henry v. Hotaling, supra*, 41 Cal. at 28 ("If there is no debt there is no

11 mortgage"); *Adler v. Sargent* (1895) 109 Cal. 42, 48 ("unless there be some other

12 law to the contrary, one in possession of a mere instrument of mortgage, which

13 purports on its face to be security for a certain note, is bound to know that if the

14 note had been assigned to another the mortgage is of no legal value to him");

15 *Seidell v. Tuxedo Land Co., supra*, 216 Cal. at 170 (finding that no separate

16 assignment of the promissory note had been made).]  As such, the Deed of Trust

17 was unenforceable *from the very beginning,* as MERS was never identified as the

18 "lender" (AHMSI was), and therefore was never the "holder" of the beneficial

19 interest under the Note.[3]  As such, the Deed of Trust was "of no legal value," and

20 any and all subsequent acts taken pursuant to it, including the impending trustee

21 sale of Plaintiffs' Property, is without legal effect. The first "prong" of the Court's

22 analysis weighs heavily in favor of the Plaintiffs.

23

24

25

26

27

28

---

[3] *Vargas* notes: "MERS has not brought to court the note here at issue, and makes no pretense that it holds the note. Indeed, ***MERS is not in the business of holding promissory notes.  Its business is only to hold deeds of trust as an agent for the holder of the note***.  This status for MERS is disclosed in the deed of trust here at issue, which states that MERS is 'acting solely as a nominee (a type of agent) for lender and lender's successors and assigns.' " 396 B.R. at 520 (emphasis added).

**EX PARTE** APPLICATION FOR TRO, ETC.

**IV.    CONCLUSION**

      Plaintiffs, through the declarations filed concurrently herewith, have made a *prima facie* showing sufficient to compel the conclusion that they have a "reasonable probability" of prevailing on the merits of their claim, and have therefore established the first "prong" necessary for the issuance of a Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction.  Plaintiffs have also shown that the balance of equities weighs heavily in their favor, since it is likely that the lien recorded against their Property is, in fact, invalid, and their forced removal from the family home will result in a severe (and unnecessary) humiliation and emotional distress. On the other hand, it may very well be that Defendants have no claim whatsoever against the Plaintiffs - either because it was never validly assigned the Note or because its subsequent actions have resulted in a waiver of its claim – and that its true recovery may lie against those who purported to assign the Note to it in the first place.

      Under such circumstances, there is no reason to subject Plaintiffs to this unwarranted and unnecessary species of damage, which can only be avoided by restraining Defendants from proceeding with the scheduled March 28, 2011 foreclosure sale of Plaintiffs' Property, or otherwise attempting to enforce the judgment of possession previously obtained.  Plaintiffs respectfully request that the Court issue a Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction, in the form submitted concurrently herewith, without delay.

Dated:  March 25, 2011          Respectfully submitted,

                                **BROOKSTONE LAW, PC**

                        By:   /s/ - Deron Colby
                                Deron Colby
                                Attorneys for Plaintiffs,
                                ANGELA AND ROBERT SACCHI

*EX PARTE* APPLICATION FOR TRO, ETC.